**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Sharita Perry, | ) | CASE NO. 19 CV 2383 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Commissioner of Social Security, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon the Report and Recommendation of Magistrate Judge David A. Ruiz ("R&R") recommending that the decision of the Commissioner be affirmed (Doc. 12). Plaintiff filed objections to the R&R. For the following reasons, the R&R is REJECTED. The decision of the Commissioner is VACATED and this matter is REMANDED to defendant for further proceedings consistent with this Opinion.

**FACTS**

The medical evidence is not in dispute and need not be fully restated. The Court adopts

1

the following evidence taken from the R&R:

> In 2006, Plaintiff was diagnosed with Chiari I malformation and pseudotumor. (Tr. 417). Plaintiff also has a history of migraines. (Tr. 417). On January 28, 2016, Plaintiff was admitted to the hospital due to worsening headaches. (Tr. 417). She presented with a severe headache with pain and pressure, along with dizziness, left hand weakness, tremors and vision blurriness. (Tr. 420). An MRI revealed slightly increased herniation of her cerebellar tonsils with minimal syringomyelia. (Tr. 428). The physician compared this MRI to a scan done in 2006 and opined that Plaintiff's headaches were caused by a Chiari malformation. (Tr. 437). The physician recommended surgical decompression. (Id.).
>
> On March 30, 2016, Dr. Alan Hoffer examined Plaintiff as a follow up from her January 28, 2016 hospitalization. (Tr. 614). Plaintiff informed Dr. Hoffer that she had a loss of strength in her left hand, headaches, blurry vision, and pain from her neck into her shoulder. (Tr. 614). Dr. Hoffer opined that Plaintiff's headaches were consistent with Chiari malformation, and that she was a candidate for a Chiari decompression with duraplasty. (Tr. 616).
>
> Plaintiff underwent a Chiari decompression with duraplasty on May 26, 2016. (Tr. 519). On June 7, 2016, Plaintiff presented to the emergency room with complaints of head pressure. (Tr. 504-506). A CT scan revealed fluid collection along the craniectomy and posterior subcutaneous deep fascia of the neck, suggestive of pseudomeningocele. (Tr. 513). Plaintiff was admitted and had a lumbar drain placed. (Tr. 507). She had a preoperative diagnosis of intracranial hypertension and pseudomeningocele for which Plaintiff underwent a right frontal shunt with frameless stereotaxy on June 9, 2016. (Tr. 517).
>
> On June 27, 2016, Plaintiff was examined by Dr. Hoffer, and noted having headaches and pressure two to three times a week, which was an improvement. Plaintiff reported word-finding difficulty, forgetfulness and confusion. (Tr. 611). The doctor noted she was recovering well and to follow-up in two months. (Tr.612).
>
> On September 21, 2016, Plaintiff again saw Dr. Hoffer regarding her history of Chiari malformation with decompression and shunt placement. (Tr. 608). Plaintiff reported feeling tired and having daily headaches. (Tr. 608). Dr. Hoffer opined that much of Plaintiff's neck pain was related to post-surgical scarring and referred her to physical therapy to work on neck strength and flexibility. (Tr. 609).
>
> On September 23, 2016, Plaintiff began treating with Dr. Deborah Reed, a neurologist specializing in headaches. (Tr. 696). Plaintiff reported that her headaches got worse in November 2006, following the birth of her son earlier that year, but they had improved since the decompression in May of 2016 and shunt placement in

> June of 2016. (Tr. 696). Plaintiff took medications as necessary for headaches and had trouble falling and staying asleep. (Tr. 696-670). She reported pain at the surgical area. (Tr. 697). Dr. Reed prescribed Neurontin and Norflex to address Plaintiff's headaches. (Tr. 700).
>
> On November 7, 2016, Plaintiff was admitted to the hospital due to a progressive headache. (Tr. 554). A lumbar puncture demonstrated opening pressure and an exploratory surgery of the shunt was performed on November 8, 2016, due to the return of symptoms. (Tr. 556). A post-operative CT showed that the catheter was in a good position and that her pseudomeningocele had improved. (Tr. 583, 587, 713-14).
>
> Dr. Hoffer examined Plaintiff on December 12, 2016. Plaintiff was recovering well from surgery and her shunt appeared to be working better. (Tr. 606). Plaintiff treated with Dr. Reed in December of 2016 and February of 2017, and the doctor reported that Plaintiff had tenderness over her shunt tubing. (Tr. 702, 704, 712).
>
> Plaintiff saw Dr. Hoffer, on January 23, 2017, with a recurrence of headaches, now at the crown of her head, in the back of her head and sometimes in the bitemporal regions. (Tr. 602). The record notes active problems include acute intractable headache, Chiari malformation, edema of the optic nerve, migraine headaches, osteoarthritis of the cervical spine among other conditions.(Tr. 602-603).
>
> On February 24, 2017, Plaintiff told Dr. Reed that the shunt made things better initially, but the headaches became worse. (Tr. 709). Dr. Hoffer noted, on March 22, 2017, that Plaintiff continued to have drainage from part of her incision, but there was no significant fluid collection under the incision and no signs of significant infection. (Tr. 599- 600). Plaintiff continued to treat with Dr. Reed on April 28, 2017, July 28, 2017, and on December 29, 2017, regarding her ongoing headaches. (Tr. 716, 724-725, 730).
>
> On November 19, 2017, Plaintiff was treated in the emergency department for worsening headaches. (Tr. 655). Image studies showed an apparent kinking of the right ventriculostomy catheter in the right upper quadrant. (Tr. 662).
>
> In March of 2018, Plaintiff was treated in the emergency department for worsening headaches. (Tr. 739). She was assessed with pseudotumor cerebri (improving) and acute intractable headache (new). (Tr. 740). The attending physician determined that her headache was not related to her Chiari I malformation and her shunt appeared to be functioning well. (Tr. 741).

R&R at 3-6.

> Dr. Congbalay, a State agency consultant, opined that plaintiff could perform work at the

light exertional level. The ALJ afforded this opinion great weight. In the decision, the ALJ noted as follows:

> Maria Congbalay, M.D. opined that the claimant could perform work at the light exertional level, further limited to frequently climbing ramps/stairs, but never climbing ladders, ropes, or scaffolds, and frequently balancing, kneeling, and crouching, and occasionally stooping and crawling (Ex. B6A/11; B7A/11). Further, Dr. Congbalay opined that the claimant should avoid all exposure to hazards (e.g., machinery or heights, etc.) (Ex. B6A/12; B7A/12). The undersigned gives great weight to Dr. Congbalay's opinion, finding that her opinion is consistent with the objective medical evidence in the record. The record shows that the claimant's headaches have worsened, [ ] and that despite [a number of medical] procedures, she continues to have frequent headaches and visits to the emergency department, consistent with a finding of light work with the postural and environmental limitations as described in the residual functional capacity (Ex. B3F; B4F; B8F; B9F; B14F).

(Tr. 56).

Plaintiff offered the opinion of her treating neurologist, Dr. Reed. Dr. Reed completed a headache residual functional capacity ("RFC") questionnaire. Dr. Reed opined that plaintiff could be expected to miss work more than four times per month and would require unscheduled breaks throughout the day in order to lie down. The ALJ afforded this opinion little weight.[1]

The ALJ reasoned:

> The undersigned gives Dr. Reed's opinion little weight, finding that the record does not support the absenteeism or unscheduled breaks she suggests. The record shows that the claimant's headaches have worsened, that she has had decompression surgery, shunt placement with subsequent malfunction and surgery to revise the shunt placement, and that despite all of these procedures, she continues to have frequent headaches and visits to the emergency department, but that she is able to work at a call center, consistent with a finding of light work with the postural and environmental limitations as described in the residual functional capacity (Ex. B3F; B4F; B8F; B9F; Bl4F

---

[1] There is other opinion evidence in the record directed at other impairments. The Court did not include these opinions as they are not relevant to the objections raised by plaintiff.

4

Plaintiff testified at the hearing.  She indicated that she began working at a call center on a full-time basis three months prior to the hearing.  She further testified that she missed four or five days of work due to neurological symptoms.  With regard to personal activities, plaintiff stated that she is able to do the laundry and most of the cooking.  On a day she has a headache, however, she is unable to perform these activities.

A vocational expert ("VE") also testified at the hearing.  The ALJ asked the VE a hypothetical question consistent with the ALJ's RFC finding.  The hypothetical contained no restriction for absenteeism.  The VE testified that jobs exist for a person with the limitations identified. The ALJ posed a second hypothetical to the VE:

> Q:     I'm adding another limitation to that hypothetical.  I'd like you to assume that this hypothetical individual would be absent from work more than four times per month.  Would that hypothetical individual be able to perform those jobs you've identified?
>
> A:     No, Your Honor.  That's not covered under the DOT, but based on my experience, HR, and policy, the maximum absenteeism tolerated is one day per month.  Anything beyond that becomes work preclusive.

The hypothetical absenteeism limitation of "more than four times per month" is consistent with Dr. Reed's opinion.

Ultimately, the ALJ did not include any absenteeism limitation in the RFC.  Based on plaintiff's RFC and the VE's testimony, the ALJ determined that plaintiff is not disabled. Plaintiff appealed the determination to this Court. The R&R recommends affirming the ALJ's determination.  Plaintiff filed objections on two grounds.  First, plaintiff objects on the basis that the ALJ erred in assigning little weight to the opinion of Dr. Reed, plaintiff's treating physician. Second, plaintiff objects that the ALJ erred in determining plaintiff's RFC because there is no

5

limitation regarding absenteeism.

Because the Court finds that remand is required as a result of plaintiff's objection to the RFC, the Court will address this issue first. Here, the ALJ found no limitation regarding absenteeism. In so doing, the ALJ assigned little weight to the opinion of Dr. Reed, who opined that plaintiff would miss work more than four times per month. The ALJ indicated that the opinion warranted little weight based on plaintiff's testimony[2] that she had been working full-time at a call center for the three months preceding the hearing.[3] In relying on plaintiff's return to "full-time" work, the also ALJ noted that plaintiff "did testify, however, that as of the date of the hearing, she had missed about four or five days due to neurological symptoms." In other words, the ALJ relied on plaintiff's testimony regarding her employment status to discount the opinion of plaintiff's treating physician.

On the other hand, it is not clear whether the ALJ considered plaintiff's testimony that she missed four to five days of work during the three-month period leading up to the hearing. The VE testified that such a limitation would be work preclusive. While credibility determinations are accorded great weight and deference, the assessment of a claimant's symptoms must be sufficiently specific to allow for meaningful review. *See*, SSR 16-3P, 2017 WL 5180304 (Oct. 17, 2017)("The determination or decision must contain specific reasons for

---

[2] Record Exhibit B8D supports the conclusion that plaintiff began working in February. The ALJ relied on plaintiff's testimony, however, in determining that plaintiff is a full-time employee. (R. 48).

[3] The ALJ also noted that plaintiff worked during the second half of 2017 for two different employers, earning approximately $5,100.00 in total.

the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."). The Court simply cannot say, based on a complete reading of the decision, whether the ALJ overlooked plaintiff's testimony regarding her absenteeism at her current job, or found that the testimony is not credible.

In assessing credibility, the ALJ noted that

after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 53).

With regard to plaintiff's headaches, the ALJ went on to state as follows:

Various factors are inconsistent with limitations to the degree alleged. While the claimant certainly has a long and complicated history of migraine headaches, with Chiari I malformation, pseudomeningocele with shunt placement, idiopathic intracranial hypertension, and pseudotumor cerebri syndrome which, together, have required surgeries, procedures, and hospitalizations. However, she returned to work in mid-2017, earning less than substantial gainful activity, and has been working full-time since February 2018. She did testify, however, that as of the date of the hearing, she had missed about four or five days due to her neurological symptoms.

(R. 55).

On its face, it appears that the ALJ may have accepted plaintiff's testimony that she missed four or five days of work since February of 2018. If so, plaintiff missed more than one day per month, yet the ALJ included no absenteeism restriction in the RFC. This is significant because the VE testified that missing more than one day per month is work preclusive. On the other hand, it is possible that the ALJ found plaintiff's testimony as to her full-time status

credible, yet rejected her testimony regarding the number of days she missed work at that same job. But, the ALJ offers no basis for this conclusion. Rather, in finding plaintiff less than credible, the ALJ points to the fact that plaintiff returned to work in 2017 and had a "full-time" job for the past three months. It is not clear to the Court why plaintiff's work at two different employers in 2017,[4] as well as her "full time work" in 2018, would undermine her credibility with regard to absenteeism.[5] Of course, credibility determinations are largely left to the ALJ. But, the ALJ must articulate the reasons for those determinations sufficient for a reviewing court to assess the issue. The ALJ did not do so here, and remand is required.

### CONCLUSION

For the foregoing reasons, the R&R is REJECTED. The decision of the Commissioner is VACATED and this matter is REMANDED to defendant for further proceedings consistent with this Opinion.

IT IS SO ORDERED.

Dated: 3/5/21

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

---

[4] The Court notes with respect to one of those jobs, plaintiff testified that she worked for one to two months and missed work. Plaintiff was ultimately hospitalized during this one-to-two month period. (R. 91-92)

[5] The Magistrate Judge noted that plaintiff's current employment is consistent with the RFC. This statement, however, is only accurate if the ALJ rejected plaintiff's testimony regarding her absences from that job. It is simply not clear whether the ALJ did so.